ANINOS v. PETROULEAS.

1. Cancellation of Instruments—Insane Persons—Fraud—Evidence.

On *de novo* review of suit to set aside agreement whereby plaintiff and his brother had transferred control of a corporation engaged in the bakery business to individual defendant who invested a substantial sum in cash in what was then a losing venture, findings of fact of various State and Federal judicial officers that such defendant had not overreached nor been guilty of fraud *held*, substantiated under record presented, hence circuit judge's decree setting instrument aside, although the tangible property had all been sold in a bankruptcy proceeding, and awarding money decree to plaintiff after finding him insane is vacated and bill dismissed.

2. Evidence—Value of Property—Sworn Statements by Taxpayer.

Statements to assessors, sworn to by taxpayer, have considerable probative value in determining value of property.

3. INSANE PERSONS—CONTRACTS—FRAUD—OVERREACHING.
    If a person enters into a contract with a person who is mentally
    incompetent but who has not been adjudged insane, the con-
    tract is not void but only voidable and there can only be lia-
    bility if fraud or overreaching has been exercised.

Appeal from Wayne; Jayne (Ira W.), J. Sub-
mitted April 3, 1946. (Docket No. 34, Calendar No.
42,945.) Decided May 13, 1946.

Bill by Peter Aninos against Christ G. Petrouleas
and another to cancel and set aside an agreement
and to fix rentals on real estate and for other relief.
Frances Aninos appointed guardian *ad litem* for
plaintiff. Decree for plaintiff. Defendants appeal.
Reversed and bill dismissed.

*Isaac M. Smullin* and *Walter M. Nelson*, for plain-
tiff.

*Brashear & Brashear* and *Frank M. Lemke,* for
defendants.

BUTZEL, C. J. On September 8, 1941, Peter
Aninos, plaintiff, filed a bill of complaint alleging
that prior to September 24, 1936, he owned a con-
trolling interest in the Atlantic Baking Company;
that the business was a well-established and profit-
able one having assets, including good will, worth
in excess of $60,000; that the bakery was conducted
in a building on land located in Detroit, the title to
which was vested in plaintiff and his brother Louis;
that this property had a value of $75,000. He further
stated that he had been in the business for over 21
years, and in full charge of it, and that it was in a
flourishing condition up to September, 1935. He
further alleged that on September 1, 1935, he became
ill and was hospitalized, and as a result he left the

business in charge of his brother Louis; that during his illness defendant Christ G. Petrouleas entered into a contract, hereinafter referred to as exhibit A, with plaintiff and his brother, and that plaintiff lost control of the business to defendant Petrouleas who took advantage of plaintiff's mental condition, and also advised him to go away and have a good time and upon his return he would be "boss" again. Plaintiff further claims that the title to the real estate was also obtained from him by defendant acting in the name of the corporation, and that such real estate was deeded by plaintiff and his brother to defendant Service Baking Company, the name which the corporation, the Atlantic Baking Company, had adopted through amendment of charter as provided by exhibit A. He asked that exhibit A be set aside, and that plaintiff be restored to the full possession of both the business and real estate. He made no offer to do equity nor to restore to Petrouleas that which he had invested in the business. We herein refer to Petrouleas as defendant unless otherwise indicated.

Exhibit A is dated September 24, 1936, and is signed by defendant Petrouleas, plaintiff Peter Aninos and his brother Louis. It recites that plaintiff and his brother Louis each owned 30 shares of the capital stock totaling 60 shares at $100 par value of the Atlantic Baking Company, which was engaged in the bakery business; that they also held title to the property used by the business, subject to two mortgages aggregating $14,138.25. It provided that the name of the corporation be changed to Service Baking Company, and that the capital be increased from $6,000 to $50,000, consisting of 5,000 shares of $10 each. Plaintiff and brother were to receive a total of 600 shares of $10 par value in place of their former 60 shares of $100 par value. It further provided

that defendant Petrouleas should purchase 1513 of the new shares so as to provide for additional capital of $15,130. It also provided that the real estate owned by Peter and Louis be deeded to the corporation which agreed to pay them $11,380, assume the mortgages totaling $14,138.25, and also issue to them as a further consideration 853 shares of stock of $10 each, making their joint holdings 1,453 shares in contrast with defendant's 1,513 shares.

Defendant thus became owner of a majority of the stock issued. The Atlantic Baking Company, the name by which the corporation was known prior to September 24, 1936, separately consented to the agreement, Peter and Louis as president and secretary signing in its behalf. The agreement was witnessed by the attorney who represented defendant, as well as by the one who represented Peter and Louis. Other provisions of the contract are not material to the issue in this litigation and are not set forth.

When the trial court made the determination that Peter was insane, Frances Aninos, wife of Louis, was appointed guardian *ad litem* to continue the suit against the corporation and Petrouleas.

The Atlantic Baking Company originally was a partnership which was formed in 1923 with Peter and Louis as copartners. In 1927 it was incorporated with a stated capital of $70,000. The assets together with the real estate, standing in the name of Peter and Louis, were turned over to the new corporation. In 1933 the corporation lost its charter for failure to pay the franchise fee. The same year a new corporation was formed, again under the name of Atlantic Baking Company. Only the personal property was transferred to the new corporation; the title to the real estate remaining vested in Peter and Louis as tenants in common. The

paid-in capital was represented as $6,000, for which the 60 shares of stock were issued. One-half of the stock was issued to Peter and the other half to Louis.

There is no doubt but that in 1935 Peter became seriously ill, suffering from some form of brain disturbance due to syphilis. Louis Aninos is the main witness in the case. He claims that notwithstanding the records to the contrary Peter really owned the entire business. He very glibly gave testimony that the business was worth at least $140,000, shortly prior to defendant's investing in the business. However, on February 3, 1936, he presented a petition to the probate court in accordance with 2 Comp. Laws 1929, § 8295 (Stat. Ann. § 16.281). This was not a petition for an adjudication of insanity or the appointment of a guardian; it was solely for the purpose, as provided by statute, to enable persons without means to secure hospital treatment. Louis represented that Peter was afflicted with a malady which he believed could be benefited by proper hospital care and medical and surgical treatment, and that Peter had no means of his own with which to provide such treatment and care. This sworn petition made in 1936 contradicts his statement on the stand that the business, alleged to have been owned by Peter, was worth at the time $140,000, which evaluation may have influenced the trial judge. This is one of the many instances of the contradictory statements made by Louis and shows how little credence can be given to his testimony.

Peter did enter the hospital in 1935, and he showed every sign of syphilis affecting the brain. However, he had not been adjudged insane and was under no guardianship or control. He did respond to malarial treatment. The doctor, who was senior associate of the neuropsychiatry department of the Ford Hospital, Detroit, first saw Peter September 30, 1935.

In March, 1936, Peter was released from the hospital though not completely cured at the time. He went to the hospital for treatment at intervals. The doctor on November 26, 1941, testified that Peter never would be entirely cured, but on August 14, 1942, the same doctor made an affidavit in the probate court that Peter was mentally competent and should be restored to all of his rights. Peter had never been adjudged a mentally incompetent person prior to the beginning of this trial. This was five years after exhibit A was entered into. On December 15, 1944, the probate court entered an order that Peter was mentally competent and that he be restored to full rights.

The testimony showed that exhibit A was not entered into in haste. Prior to meeting defendant, the bakery company was approaching financial disaster. A flour salesman by the name of Chiflakos was asked to seek assistance. For 23 days he tried to interest others in the bakery, but without success. He testified as plaintiff's witness and stated that the bakery was worth $140,000. However, he admitted that he told defendant that the business was only doing $100 a day, at which rate it was losing money, that it was deeply involved in debt, that it could break even if it did a business of $250 a day, that it could be made into a paying business, but required new equipment and a new investment of $9,000. He admitted that the business was run down and that unless the business did get someone to come to its rescue, it could not last. Most of the help had been discharged; there were only three people working at the bakery.

Defendant did not seek out the business. His aid was sought. Defendant put his money into a losing venture and tried to resuscitate it by the investment of a large amount of additional capital. The record

indicates that thereafter the condition of the business was improving, until it was absolutely killed by the devastating litigation that followed.

When Peter was released from the hospital he first went south for a very brief stay. Shortly after his return, however, a large sum of money was paid to him by the corporation in pursuance of the agreement, and thus he was able to go to Greece where he remained a year and a half. He married while there and returned to this country with his wife and for a short time resumed employment at the bakery. However, in 1938, he commenced divorce proceedings against his wife, who was represented by one of his present counsel. She filed a cross bill and succeeded in obtaining a divorce from one whom counsel now contends was "insane." Contempt proceedings were instituted and resulted in the incarceration of Peter in the Detroit House of Correction for nonpayment of alimony. On or about this time Peter by written instrument transferred his stock and all claims of every kind against the corporation and against defendant to his brother Louis who accepted such an assignment from the alleged "insane" man. Louis thereupon under date of June 11, 1938, in his own name and as assignee of Peter, on receipt of 454 shares of stock, signed a complete release in full of all claims against the corporation and the defendant. Peter also gave his written consent to and approved of the release. Defendant contends that this was a complete ratification of everything that had been previously done and disposed of all claims by Peter. However, suit was begun and the bill of complaint filed. In justice to Mr. Nelson, one of plaintiff's present counsel, it should be stated that he did not become one of the attorneys in the case until after the bankruptcy petition hereinafter referred to was filed. Motions

in the case were heard by several circuit judges. An injunction was issued restraining defendants from any action except in the regular course of business, but providing that they might proceed with the installation of the new equipment that had been begun. A considerable period after the modification of the injunction, during one of the hearings, the trial judge enjoined the further installation of all improvements that had been ordered. Thereupon the corporation filed a petition in bankruptcy. It was contested.

Appeal was taken from the determination of the referee adjudicating the corporation bankrupt. The district court of the United States for the eastern district of Michigan found "that the corporation was in a serious financial condition due principally to the proceedings in the Wayne circuit court," and refused to vacate the adjudication in bankruptcy and certified when the cause was further appealed that "such appeal is not taken in good faith and that it is not meritorious, but is frivolous." The schedules in the bankruptcy court include in the liabilities an amount in excess of $20,000 due to the inability of the corporation to permit the fulfillment of the contracts for new equipment. The completion of the installation of the new equipment had been enjoined by the order of the circuit court trial judge.

When appeal was taken by plaintiff to the United States Circuit Court of Appeals for the 6th District, the court did find the appeal was not in good faith and in an opinion written by the Honorable Thomas F. McAllister, circuit judge, denied the plaintiff all relief against the corporation, stating that if he had any claim against Petrouleas, it should be fought out in the State court. The opinion is set forth in *Aninos* v. *McGuire* (C. C. A.), 127 Fed. (2d) 817. The conflicting claims were set forth and the opinion

shows that the liabilities of the corporation at the time were $99,190.75 against assets of $24,817.57. We quote from the opinion as follows:

"When the corporation was adjudicated bankrupt, Frances Aninos, guardian *ad litem* of Peter Aninos, filed a petition similar to one filed by Louis Aninos, based upon alleged fraud and deceit on the part of Petrouleas, in taking advantage of the mental incapacity of Peter Aninos. But Louis Aninos was a party to the same transaction, and had been advised by legal counsel throughout the matter; and it seems remarkable that on June 11, 1938, two years after the alleged insanity of Peter Aninos, upon which so much reliance is placed by appellant and Louis Aninos, we find that Louis and Peter were executing contracts in which Peter assigned all of his rights and claims against the corporation, to Louis, at the same time executing a power of attorney to him; and both brothers, pursuant to action at a meeting of the corporate directors, executed an instrument, in consideration of a certain stock transfer, discharging the corporation and Petrouleas from all claims Peter and Louis might have against them."

Thereafter, Peter presented a petition for reclamation in which he sought to have all the property returned to him. The petition was heard by the Honorable George A. Marston, referee in bankruptcy, who wrote a very complete and comprehensive opinion in which he discussed all the details of the transactions. He found that there was no fraud on the part of defendants and completely exonerated them from all claims of fraud and liability. He placed the blame for the litigation where it belonged, stating "that the claim constitutes an attempt to perpetrate a rank injustice against Christ G. Petrouleas, who has invested upwards of $36,000 in the stock of this corporation, and who stands to lose his entire investment. I believe the

claim was presented in bad faith, and that it has no merit whatsoever.''

Meanwhile, in the State court the case had proceeded with a reference to the Honorable Arthur W. Sempliner, circuit court commissioner, who found defendant Petrouleas took nothing from plaintiff. The trial judge, however, re-referred the case to the Honorable Frank FitzGerald, circuit court commissioner, who went into the case very exhaustively. He took a great deal of testimony, and he made findings in which defendant was completely exonerated from any fraud or any liability whatsoever.

Limitations of time and space prevent us from setting forth this report in the opinion, for it completely answers all of the claims made that Petrouleas either overreached, or was guilty of any fraud of any kind.

To further satisfy ourselves we, however, have examined the record closely, as we hear an equity case *de novo*. We are in total accord with the findings of fact by all the judicial officers thus far named who previously passed upon the issues. We believe it proper to call attention to some of the very pertinent facts. Louis Aninos, as treasurer of the corporation, signed the answer to the bill of complaint denying the main allegations claiming defendant or the corporation was liable. In spite of the high value placed on the property by Louis and a few other witnesses who testified in the case, we go to the written records for facts. The machinery was antiquated. The schedules in the bankruptcy petition show that at the time the petition was filed approximately $29,000 of machinery and equipment were being purchased under chattel mortgage, and only part of them had been delivered and part of them had been installed. This indicates an honest effort on the part of defendant and the management

to rehabilitate the company in which a large share of stock stood in Louis' name, although the latter claims that it belonged to Peter. We realize that the amount of taxes assessed on property frequently does not reflect its true value, but when statements to the assessors are sworn to by the taxpayer they have considerable probative value. In 1930 the real estate and buildings were valued at $21,000; personal property, $3,356.64. This valuation was constantly being reduced. In 1933 the real estate and buildings were valued at $7,500, the personal property at $1,650; and the personal property was valued in 1934 at $1,475; in 1935 at $1,328; in 1936 at $1,325. A sworn petition to the common council of the city of Detroit in 1929 shows as follows:

"Petition of Atlantic Baking Company, ward 19, Personal: Having filed a statement showing depreciation of 33⅓% we are petitioning that the amount be reduced $10,000 about 25%. The reason is that the machinery is not worth the valuation of $10,000. It was purchased when the prices were high, absurdly high priced for the contract in the first place. It originally cost $14,300. Some of it is very old, the ovens and big machinery about five years old, the ovens are obsolete."

In 1935 the corporation's income tax for the year ending November 30th represented it had sustained a loss of $1,196.16 and had assets of $14,321.51 as against $9,419.91 in liabilities. Net worth consisted of outstanding capital stock of $6,000 less a deficit of $1,098.40. Peter had withdrawn $950 for the year and Louis $2,015. The sworn annual report to the State of Michigan for the year ending November 30, 1935, the year prior to the execution of exhibit 1, a year before defendant acquired an interest, coincided with the above-mentioned income tax report, showing that the net worth was only $4,901.60.

In the answer to the bill of complaint signed by
Louis, he stated that just prior to September 24,
1936, the total property and assets, including good
will, were worth not in excess of $10,000, and the
liabilities were in excess of $24,000, but despite this
on the stand he stated the assets were worth
$140,000. He also stated that at the time it was
losing $600 a month.

We do not believe it necessary to give further
details, which also show that no fraud of any kind
was perpetrated by defendant, who actually invested
$36,360 for which he received 3,636 shares of stock.
His withdrawals from the business were exceedingly
modest. There was no exercise of control for the
benefit of defendant or any showing of unfair deal-
ing. If there were any just cause for complaint, it
would be exclusively by defendant, not by plaintiff.
The judge mainly relied upon the testimony indi-
cating that Peter was insane. At the time defendant
entered into the contract, the business was headed
for disaster. Plaintiff had been released from the
hospital but was sane enough to participate in the
contract and prior negotiations assisted by his own
attorney. He was sane enough to go to Greece by
himself, and on his return to turn whatever prop-
erty he had to his brother when confronted by the
divorce suit. It was conceded by defendant's coun-
sel at the oral argument that if a person enters into
a contract with a person who had not been adjudged
insane, the contract is not void but only voidable,
and there can only be liability if fraud or overreach-
ing has been exercised. *Moran* v. *Moran*, 106 Mich.
8 (58 Am. St. Rep. 462); *Dodds* v. *Purdy*, 277 Mich.
593; *Lynder* v. *Schulkin*, 305 Mich. 451.

The trial judge held that Peter was insane and
never would recover his sanity, notwithstanding the
sworn statement of the main doctor in the probate
court to the effect that plaintiff had recovered his

sanity. The judge accepted the statement by Louis corroborated by two others as to the value of the property, notwithstanding that actual figures belie these estimates. The judge set the entire transaction aside although the real estate and personal property had been sold out in the bankruptcy proceedings. He gave plaintiff a money decree of $15,000. We find no basis whatsoever for it. Other questions specifically raised have been answered in this opinion, or have not sufficient merit so as to require discussion.

The decree is set aside and one may be entered here dismissing the bill, with costs of this court and the trial court to defendant Christ G. Petrouleas.

Carr, Bushnell, Sharpe, Boyles, Reid, North, and Starr, JJ., concurred.